(Slip Opinion)

# Preemptive Effect of Defense Production Act Order on State Law

Presidential orders issued as an exercise of congressionally delegated authority or the President's constitutional powers have the force of federal law under the Supremacy Clause and may preempt state law.

An order issued pursuant to the Defense Production Act may preempt state laws expressly or by conflict.

An order issued pursuant to the Defense Production Act may displace sanctions for non-compliance with a contrary consent decree, even if that consent decree rests on federal-law claims.

March 3, 2026

MEMORANDUM OPINION FOR THE GENERAL COUNSEL
DEPARTMENT OF ENERGY

Sable Offshore Corp. ("Sable") is the lessee and operator of the Santa Ynez Unit ("SYU"), an offshore oil and gas unit located in federal waters off the coast of California. Sable and the Department of the Interior are updating a previously approved Development and Production Plan, which would allow for continuous production on the SYU to address energy vulnerabilities on the West Coast. But, according to Sable, the State of California has impeded it from operating the SYU and transporting production through the Santa Ynez Pipeline System.

You have asked whether an order issued under the Defense Production Act of 1950 ("DPA" or "Act"), Pub. L. No. 81-774, 64 Stat. 798 (codified as amended at 50 U.S.C. § 4501 *et seq.*), to Sable by the President or his delegee would preempt the California laws currently impeding Sable from resuming production and operating the associated pipeline infrastructure. We conclude that it would. An order issued as an exercise of congressionally delegated authority or the President's constitutional powers has the force of federal law under the Supremacy Clause and may preempt contrary state law. Because the DPA authorizes the President to order certain actions that may otherwise be prohibited by state law, an order issued pursuant to the DPA could preempt those laws expressly or by conflict. That is true regardless of the form of the President's order, although we refer in this memorandum to executive orders for simplicity. *See Legal Effectiveness of a Presidential Directive, as Compared to an Executive*

1

*Order*, 24 Op. O.L.C. 29, 29 (2000) ("[T]here is no substantive difference in the legal effectiveness of an executive order and a presidential directive that is styled other than as an executive order.").[1]

I.

A.

On January 20, 2025, President Trump declared a national emergency related to the Nation's energy supply and infrastructure. *See generally* Exec. Order No. 14156. The President determined that the Nation's "insufficient energy production, transportation, refining, and generation constitutes an unusual and extraordinary threat to our Nation's economy, national security, and foreign policy." *Id.* § 1. "These numerous problems," the President emphasized, "are most pronounced in our Nation's Northeast and West Coast, where dangerous State and local policies jeopardize our Nation's core national defense and security needs." *Id.*

The President directed the heads of executive departments and agencies to wield "any lawful emergency authorities available to them" to bolster the "production, transportation, refining, and generation of domestic energy resources." *Id.* § 2(a). "If an agency assesses that use of either Federal eminent domain authorities or authorities afforded under the Defense Production Act are necessary to achieve this objective, the agency shall submit recommendations for a course of action to the

---

[1] President Obama delegated Title I authority under the DPA to the Secretary of Energy for all energy-related matters. *See* Exec. Order No. 13603 (2012). For convenience, we refer in this memorandum to determinations made, and orders given, by the President, even though that authority has been lawfully delegated to the Secretary. We note that an executive order issued by President Trump provides that if an agency seeks to invoke the DPA, it "shall submit recommendations for a course of action to the President." Exec. Order No. 14156 § 2(a) (2025). This language does not, however, impliedly limit the scope of the power delegated by the President to the Secretary. The provisions of each executive order are not "in irreconcilable conflict," nor is President Trump's order "clearly intended as a substitute" for President Obama's delegation. *Carcieri v. Salazar*, 555 U.S. 379, 395 (2009) (cleaned up). Instead, President Trump's order provides only that the Secretary should submit a recommendation to the President before wielding delegated authority. *See* Exec. Order No. 14156 § 2(a). The Secretary could, for instance, recommend that the Secretary himself—rather than the President—issue a DPA order. And nothing in President Trump's executive order requires the President's affirmative approval of a recommendation before the Secretary acts. *See generally id.*

President . . . ." *Id.* (internal citation omitted). The President also instructed agencies to expedite the completion of energy infrastructure, including by "facilitat[ing] the supply, refining, and transportation of energy in and through the West Coast of the United States." *Id.* § 3(b).

### B.

The SYU—which Sable leases and operates—is a critical energy resource on the West Coast. Located in federal waters in the Pacific Ocean, it is the largest known offshore oilfield in the United States. *See* Letter for Jonathan Brightbill, General Counsel, Department of Energy, from James W. Noe, Partner, Holland & Knight LLP, *Re: Sable Offshore Corp.—Request for Action Under the Defense Production Act* at 1 (Dec. 12, 2025) ("Sable Letter").[2] It has an estimated 904 million barrels in place, and from 1981 to 2014, it produced more than 670 million barrels of oil. *Id.*

For most of the SYU's production history, oil and gas were produced through pipeline infrastructure connecting offshore platforms to onshore facilities in Las Flores Canyon, California. *Id.* at 2. From there, crude oil was transported via onshore pipeline to a California refinery complex via the Las Flores Pipeline System. *Id.* This network of on- and offshore pipelines is known as the Santa Ynez Pipeline System. *Id.* Currently, Sable and the Department of the Interior are updating a previously approved Development and Production Plan to address West Coast energy vulnerabilities. *Id.* at 1–2.

But according to Sable, the State of California is impeding it from resuming transportation of SYU production through the Santa Ynez Pipeline System. Sable reports that "California agencies have deployed an array of state measures—including SB 237, the state waiver process, novel interpretations of state agency jurisdiction and authority, excessive delay in granting a long-term easement through a state park for an existing pipeline, and the Restart Plan requirements under [a] Consent Decree—to block pipeline operations." *Id.* at 6.

---

[2] For purposes of this advice, we accept the veracity of the factual statements set forth in Sable's letter, although we are not presently in a position to verify their accuracy.

Sable has thus requested the Secretary of Energy ("Secretary") to make necessary findings under the DPA and issue an order "requiring Sable to operate the Santa Ynez Unit and the Santa Ynez Pipeline System to maximize domestic energy production." *Id.* at 9. In Sable's view, such an order would conflict with—and therefore preempt—California state law. *Id.* at 6.

**II.**

Preemption doctrine derives from the constitutional hierarchy established by the Supremacy Clause. That clause provides that "the Laws of the United States," as well as the Constitution and treaties, "shall be the supreme Law of the Land," notwithstanding "any Thing in the Constitution or Laws of any State to the Contrary." U.S. Const. art. VI, cl. 2. The Supremacy Clause thus enshrines two principles into our legal system: It places federal law above state law in the constitutional hierarchy, and it establishes a choice-of-law rule that federal law must prevail whenever it conflicts with state law. The Supreme Court has "identified three different types of preemption—conflict, express, and field—but all of them work in the same way." *Murphy v. Nat'l Collegiate Athletic Ass'n*, 584 U.S. 453, 477 (2018) (cleaned up). Federal law typically "imposes restrictions or confers rights on private actors; a state law confers rights or imposes restrictions that conflict with the federal law; and therefore the federal law takes precedence and the state law is preempted." *Id.* At times, federal law "might appear to operate directly on the States," such as in the form of an express preemption provision, but such provisions operate "just like any other federal law with preemptive effect" by conferring on private entities "a federal right to engage in certain conduct subject only to certain (federal) constraints." *Id.* at 478–79.

We first explain that an executive order may preempt state law when the President is empowered by the Constitution or statute to regulate private parties or where state law would otherwise conflict with a lawful exercise of the President's official powers. We then describe the two primary ways in which executive orders might displace state law—expressly or by conflict.

## A.

The Constitution vests the entire executive power in a single President, whose "duties are of 'unrivaled gravity and breadth.'" *Trump v. United States*, 144 S. Ct. 2312, 2327 (2024) (quoting *Trump v. Vance*, 140 S. Ct. 2412, 2425 (2020)). The President's authority to wield these powers "necessarily stems either from an act of Congress or from the Constitution itself." *Id.* (cleaned up) (quoting *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 585 (1952)). The Constitution that the President must defend, and the federal laws that he must execute, are "the supreme Law[s] of the Land." U.S. Const. art. VI, cl. 2; *see also id.* art. II, § 1, cl. 8; *id.* art. II, § 3. Of course, "the President alone and unaided could not execute the laws. He must execute them by the assistance of subordinates." *Myers v. United States*, 272 U.S. 52, 117 (1926).

The power of executive agencies—literally, the Chief Executive's agents—to preempt state law is well understood. Congress may authorize executive agencies to promulgate regulations that "have the force and effect of law." *Chrysler Corp. v. Brown*, 441 U.S. 281, 295 (1979) (citation and internal quotation marks omitted). "This doctrine is so well established that agency regulations implementing federal statutes have been held to pre-empt state law under the Supremacy Clause." *Id.* at 295–96. Put simply, when agencies issue regulations implementing federal statutes, those regulations are fully clothed in "the Laws of the United States" for purposes of preemption and therefore can displace contrary state law. U.S. Const. art. VI, cl. 2. To be sure, an agency's power to preempt state law is not unlimited. "[A] federal agency may pre-empt state law only when and if it is acting within the scope of its congressionally delegated authority, for an agency literally has no power to act, let alone pre-empt the validly enacted legislation of a sovereign State, unless and until Congress confers power upon it." *New York v. FERC*, 535 U.S. 1, 18 (2002) (cleaned up). But within the confines of delegated authority, executive preemption of state law is an unremarkable feature of our governmental structure.

This logic applies *a fortiori* to the President, who is the head of the Executive Branch and wields independent constitutional powers that agencies lack on their own. Regardless of whether the President derives his authority from statute or directly from the Constitution, he wields a piece

of federal sovereignty itself, so long as he acts within the bounds of his authority. States thus lack the power to impede the exercise of the President's official powers, as to do so would be to interfere with the United States itself. *See, e.g.*, *Tarble's Case*, 80 U.S. (13 Wall.) 397, 403–04 (1872) (holding that this rule applies "whether that authority be exercised by a Federal officer or be exercised by a Federal tribunal"); *see also In re Neagle*, 135 U.S. 1, 75 (1890) (holding that California murder law could not be applied to prosecute a federal officer "for an act which he was authorized to do by the law of the United States"). The Constitution's command that federal law prevails over contrary state law thus necessarily entails that valid presidential action preempts and displaces conflicting state law. *See In re Neagle*, 135 U.S. at 62 ("While [the federal government] is limited in the number of its powers, so far as its sovereignty extends[,] it is supreme."); *see, e.g.*, *Am. Ins. Ass'n v. Garamendi*, 539 U.S. 396, 416 (2003) (concluding that executive agreements, which do not require congressional approval, "are fit to preempt state law, just as treaties are").

Presidential preemption is most likely to arise when "the President acts pursuant to an express or implied authorization of Congress." *Youngstown Sheet & Tube Co.*, 343 U.S. at 635 (Jackson, J., concurring). In such circumstances, the President's authority to regulate "is at its maximum, for it includes all that he possesses in his own right plus all that Congress can delegate." *Id.* That is, when Congress authorizes the President to act, the President may do so in a way that shunts aside conflicting state enactments, provided he acts within the scope of the congressional authorization or his independent constitutional authority.

Like regulations issued by agencies, executive orders authorized by the Constitution or a federal statute may preempt state law. As the Supreme Court has explained, executive orders "may create rights protected against inconsistent state laws through the Supremacy Clause," especially when such orders are issued pursuant to "congressional authorization." *Old Dominion Branch No. 496, Nat'l Ass'n of Letter Carriers v. Austin*, 418 U.S. 264, 273 n.5 (1974) (citing *Youngstown Sheet & Tube Co.*, 343 U.S. at 635–37 (Jackson, J., concurring)). Our Office, too, has long recognized an executive order "can of course have the force and effect of law," "particularly" if it "rests on specific statutory authority." Memorandum for Phyllis Coven, Deputy Associate Attorney General, Office of the

Associate Attorney General, from Daniel L. Koffsky, Acting Assistant Attorney General, Office of Legal Counsel, *Re:* Matter of Chu *and* Matter of Tsun at 17 n.15 (July 1, 1993). Thus, when an executive order is authorized by the Constitution or a federal statute (or both), "it can be enforced by the government against private parties and may preempt conflicting state law." Kevin M. Stack, *The Statutory President*, 90 Iowa L. Rev. 539, 551 (2005) (footnotes omitted); *see also, e.g.*, *League of United Latin Am. Citizens v. Exec. Off. of the President*, 780 F. Supp. 3d 135, 171 (D.D.C. 2025).

Importantly, Congress need not mention preemption by name when authorizing the President to displace state law. Rather, Congress may authorize the President to preempt state law simply by conferring upon him regulatory power. *See, e.g.*, *Letter Carriers*, 418 U.S. at 273 n.5. When determining whether Congress has delegated such authority to the Executive Branch, courts simply "interpret the statute," "without any presumption one way or the other" about preemption. *FERC*, 535 U.S. at 18. "In other words, we must interpret the statute to determine whether Congress has given [the Executive Branch] the power to act," using ordinary principles of statutory interpretation. *Id.* As with any statute authorizing the Executive Branch to regulate pursuant to flexible statutory terms, courts must identify "the best reading of [the] statute" and "effectuate the will of Congress" as expressed by the text. *Loper Bright Enters. v. Raimondo*, 144 S. Ct. 2244, 2263 (2024).

In sum, executive orders may preempt state law when the President's regulatory power stems from either congressional authorization or the Constitution itself.

## B.

Executive orders, like statutes, may preempt state law in one of two ways: expressly or by implication.

Start with express preemption, which operates "through express language" in a presidential order or statute declaring certain state laws preempted. *Oneok, Inc. v. Learjet, Inc.*, 575 U.S. 373, 376 (2015); *see, e.g.*, *Preemption of State and Local Requirements Under a PREP Act Declaration*, 45 Op. O.L.C. __, at *4–10 (Jan. 19, 2021). In some prior cases, the Court would begin its preemption analysis "with the assumption

that the historic police powers of the States are not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress," especially when Congress "legislated in a field traditionally occupied by the States." *Altria Grp., Inc. v. Good*, 555 U.S. 70, 77 (2008) (cleaned up). Today, however, at least when a "statute contains an express pre-emption clause," the Court does "not invoke any presumption against preemption but instead focus[es] on the plain wording of the clause." *Puerto Rico v. Franklin Cal. Tax-Free Tr.*, 579 U.S. 115, 125 (2016) (cleaned up).[3] Of course, the existence of an express preemption clause "does not immediately end the inquiry" into a federal law's preemptive effect. *Altria Grp.*, 555 U.S. at 76. "[T]he question of the substance and scope of [the] displacement of state law still remains." *Id.* Determining the scope of an express preemption provision turns on "the plain wording of the clause." *Chamber of Com. of the U.S. v. Whiting*, 563 U.S. 582, 594 (2011) (citation omitted).

Although express preemption clauses often "appear to operate directly on the States," their preemptive effect in truth operates by conferring on private parties "a federal right to engage in certain conduct subject only to certain (federal) constraints." *Murphy*, 584 U.S. at 478–79. Federal law regulating medical devices intended for human use, for example, expressly preempts state law by declaring that no state may establish "any requirement . . . which is different from, or in addition to, any requirement applicable under this chapter to the device." 21 U.S.C. § 360k(a). This provision appears to operate directly on states, but it actually confers on medical-device manufacturers a federal right to be free from requirements other than those imposed by the federal government.

Implied preemption operates in much the same way. "This mechanism is shown most clearly in cases involving 'conflict preemption.'" *Murphy*, 584 U.S. at 478. When federal law confers a right or imposes a restriction on regulated parties, "state law is pre-empted to the extent that it actually conflicts with federal law." *English v. Gen. Elec. Co.*, 496 U.S. 72, 79 (1990). Thus, "when a regulated party cannot comply with both federal

---

[3] *See also, e.g.*, *Carson v. Monsanto Co.*, 72 F.4th 1261, 1267 (11th Cir. 2023) (en banc); *Cal. Rest. Ass'n v. City of Berkeley*, 89 F.4th 1094, 1101 (9th Cir. 2024). *But see AbbVie, Inc. v. Fitch*, 152 F.4th 635, 645 (5th Cir. 2025) (per curiam) (continuing to apply the presumption); *Nwauzor v. GEO Grp., Inc.*, 127 F.4th 750, 767–68 (9th Cir. 2025) (same).

and state directives, the Supremacy Clause tells us the state law must yield." *Martin v. United States*, 145 S. Ct. 1689, 1700 (2025); *see also Merck Sharp & Dohme Corp. v. Albrecht*, 139 S. Ct. 1668, 1672 (2019). The Supreme Court has found conflict preemption where, for example, it was impossible for a pharmaceutical company to "comply with both its state-law duty to strengthen the warnings" on the label for one of its drugs "and its federal-law duty not to alter" the label for that same drug. *Mut. Pharm. Co. v. Bartlett*, 570 U.S. 472, 480 (2013).

There are other forms of implied preemption, which we need not dwell on here. Field preemption, for instance, "occurs when federal law occupies a 'field' of regulation 'so comprehensively that it has left no room for supplementary state legislation.'" *Murphy*, 584 U.S. at 479 (quoting *R.J. Reynolds Tobacco Co. v. Durham County*, 479 U.S. 130, 140 (1986)). And obstacle preemption contemplates the displacement of state law "where the challenged state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives" of federal law. *Arizona v. United States*, 567 U.S. 387, 399 (2012) (citation and internal quotation marks omitted). But we need not address those theories today; when an executive order expressly or by conflict preempts state law, resort to these other theories of implied preemption is unnecessary.

## III.

The President may expressly or by conflict preempt certain state laws by issuing an order under the DPA. We first situate the DPA within the broader context of national-defense laws, explaining why it authorizes the President to preempt state law. We then identify the particular provisions that would most likely allow the President to preempt state law in the circumstances presented here.

## A.

"It is 'obvious and unarguable' that no governmental interest is more compelling than the security of the Nation." *Haig v. Agee*, 453 U.S. 280, 307 (1981) (quoting *Aptheker v. Sec'y of State*, 378 U.S. 500, 509 (1964)). "Recognizing this fact, the Framers listed 'providing for the common defence' as a motivating purpose for the Constitution," *Wayte v. United States*, 470 U.S. 598, 612 (1985) (cleaned up), conferring on the federal

government a "complete delegation of authority" to ensure the Nation's safety, *Torres v. Tex. Dep't of Pub. Safety*, 142 S. Ct. 2455, 2463 (2022). This power is not "limited to the 'context of an actual war.'" *Id.* at 2465 (citation omitted). It also includes the authority to act prophylactically— the government may act to secure the national defense well before the country's safety is in peril. *Cf. Dennis v. United States*, 341 U.S. 494, 509 (1951) ("Obviously, the words cannot mean that before the Government may act, it must wait until the putsch is about to be executed, the plans have been laid and the signal is awaited." (emphasis omitted)). Because national defense is vested exclusively in the federal government, "the structure of the Constitution prevents States from frustrating national objectives in this field." *Torres*, 142 S. Ct. at 2464. Even legitimate state interests generally must yield to the common defense of the Nation, for the Constitution "is not a suicide pact." *Kennedy v. Mendoza-Martinez*, 372 U.S. 144, 160 (1963).

In providing for the common defense, Congress and the President have "time and again, as exigencies arose," taken actions that have displaced ordinary state laws, such as those pertaining to property or torts. *Bank Markazi v. Peterson*, 578 U.S. 212, 235 (2016). Following World War II, for example, the Renegotiation Act allowed the federal government "to recover excess profits" on wartime contracts—even with respect to contracts between two private parties rather than only those "made directly with the Government." *Lichter v. United States*, 334 U.S. 742, 788–89 (1948). The Court upheld "the right of the Government to recover excess profits on" such contracts, *id.* at 789, emphasizing the wartime exigencies that necessitated the legislation, *see id.* at 754–72. The Court subsequently sustained President Carter's decision to nullify attachments and liens on Iranian assets in the United States and to direct that those assets be transferred to Iran. *See Dames & Moore v. Regan*, 453 U.S. 654, 660, 674 (1981). In doing so, the Supreme Court emphasized that the International Emergency Economic Powers Act ("IEEPA"), Pub. L. No. 95-223, 91 Stat. 1626, "delegate[d] broad authority to the President to act in times of national emergency with respect to property of a foreign country." 453 U.S. at 677. And because IEEPA authorized the actions taken, the Court upheld the nullification of the attachments and the transfer of the assets, traditional property rules notwithstanding. *Id.* at 674.

Modelled on "the First and Second War Powers Acts of 1941 and 1942, which gave the [E]xecutive [B]ranch broad authority to regulate industry during World War II," the DPA is yet another example of Congress delegating to the President powers to regulate domestic policy for the national defense. Alexandra G. Neenan, Cong. Rsch. Serv., R43767, *The Defense Production Act of 1950: History, Authorities, and Considerations for Congress* at 2 (updated Oct. 6, 2023), https://www.congress.gov/crs-product/R43767 [https://perma.cc/S6L9-UUJE]. The DPA differs from those earlier statutes, however, in one key respect: Although its predecessor statutes conferred sweeping authority upon the President during wartime, the DPA "is not an 'emergency' statute." *Legal Authorities Available to the President to Respond to a Severe Energy Supply Interruption or Other Substantial Reduction in Available Petroleum Products*, 6 Op. O.L.C. 644, 662 (1982) ("*Energy Supply Interruption*"). Instead, it includes power to act prophylactically. Congress recognized that "the security of the United States is dependent on the ability of the domestic industrial base to supply materials and services for the national defense." 50 U.S.C. § 4502(a)(1). The Act thus vests "the President with an array of authorities," all designed "to maintain and enhance the domestic industrial base." *Id.* § 4502(a)(4). The President may use those authorities "whether or not an 'emergency' situation exists." *Energy Supply Interruption*, 6 Op. O.L.C. at 662.

The DPA confers "broad and flexible" authority on the President to regulate private parties and preempt contrary state law. *Id.* (quoting H.R. Rep. No. 81-2759, at 4 (1950)). In general terms, section 4511 authorizes the President to control the distribution of materials, services, and facilities, and to require entities to prioritize the performance of some contracts over others, as "necessary or appropriate to promote the national defense" or "to maximize domestic energy supplies." 50 U.S.C. § 4511(a), (c). And because the President may regulate and direct private conduct when exercising such authority, he may also necessarily displace contrary state law.

And lest there be any doubt, the DPA makes explicit that orders issued pursuant to the Act displace state-law liability. It provides that "[n]o person shall be held liable for damages or penalties for any act or failure to act resulting directly or indirectly from compliance with a rule, regulation, or order issued pursuant to this chapter." *Id.* § 4557. Such immunity

from liability exists even when the related DPA rule, regulation, or order is subsequently "declared by judicial or other competent authority to be invalid." *Id.* Section 4557 is an express preemption provision, even though it does not appear to operate directly on state law. *See Murphy*, 584 U.S. at 478. "It confers on private entities . . . a federal right to engage in certain conduct"—conduct required by a DPA order—"subject only to certain (federal) constraints," not constraints imposed by state law. *Id.* at 478–79.

The provisions in section 4511 authorizing the President to issue regulatory (and thus preemptive) orders are united by a central principle: necessity. At a high level, section 4511(a) allows the President to require the prioritized performance of certain contracts or to allocate materials and other resources as he considers "necessary or appropriate to promote the national defense." 50 U.S.C. § 4511(a)(1)–(2). Section 4511(c) similarly allows the President to require the priority performance of certain contracts or allocate materials and resources "in order to maximize domestic energy supplies." *Id.* § 4511(c)(1). Ensuring the availability of such energy supplies, the DPA makes clear, is "necessary and appropriate" to secure "national defense preparedness." *Id.* § 4502(a)(5).

Necessity has long functioned as a defense to private liability under state law. When an otherwise tortious action—like trespass or conversion—is necessary to avoid "public disaster," the actor will not be held liable under tort law. *See* Restatement (Second) of Torts § 196 (1965) (trespass); *id.* § 262 (conversion); *see also id.* § 892D (describing the emergency doctrine). Necessity similarly excuses contractual nonperformance when supervening events make performance impracticable or frustrate the contract's purpose. *See* Restatement (Second) of Contracts § 261 (1981) (discharge by supervening impracticability); *id.* § 265 (discharge by supervening frustration). And force majeure clauses typically "relieve a party from its contractual duties when its performance has been prevented by a force beyond its control." *JN Contemp. Art LLC v. Phillips Auctioneers LLC*, 29 F.4th 118, 123 (2d Cir. 2022) (citation omitted). Necessity even may excuse liability for criminal conduct: "Every American jurisdiction, without exception, has adopted the necessity defense in its criminal jurisprudence." Shaun P. Martin, *The Radical Necessity Defense*, 73 U. Cin. L. Rev. 1527, 1535 (2005).

The DPA operates on parallel logic to preempt state private law. When compliance with a presidential DPA order would otherwise violate state law—whether by causing tortious injury or breaching contractual obligations—the Act displaces that liability in the name of national defense. *See* 50 U.S.C. § 4557. Indeed, the DPA expressly contemplates reprioritizing contractual commitments for national-defense interests, notwithstanding that doing so may cause a party to breach its obligations under state contract law. *See id.* § 4511(a)(1), (c).

The DPA's displacement of state regulatory law follows from the same principle. State regulation often accomplishes *ex ante* what private law accomplishes *ex post*—the mitigation of social costs. *See* Susan Rose Ackerman, *Regulation and the Law of Torts*, 81 Am. Econ. Rev. 54, 54 (1991). The means are different, but the purpose is the same. For example, a state licensing regime and common-law negligence each address the risk of substandard professional conduct. Environmental regulations and common-law nuisance claims each address pollution and its harmful effects. *Cf.* Samuel Issacharoff, *Regulating After the Fact*, 56 DePaul L. Rev. 375, 380 (2007) ("The key is that both ex ante and ex post review are essential parts of the regulatory model—sometimes operating in tandem, sometimes as substitutes." (emphasis omitted)). The DPA contemplates the preemption of *ex ante* regulations much as it contemplates the preemption of *ex post* private-law remedies, all in the name of necessity. After all, although the interests protected by state regulation are doubtlessly important, "[f]ew interests can be more compelling than a nation's need to ensure its own security." *Wayte*, 470 U.S. at 611.

"Necessity" is not, of course, a constitutional prerequisite for Congress to confer on the President preemptive authority. But the Act functions as the Nation's necessity defense to state law. And under the DPA, the President possesses broad discretion to determine when to invoke that immunity, *see* 50 U.S.C. § 4511(a), (c), for it is the President who possesses the institutional competence to make such judgments on behalf of the Nation, *see id.* § 4502(a)(4); *see also Holder v. Humanitarian L. Project*, 561 U.S. 1, 33 (2010) (emphasizing the need to defer to the "evaluation of the facts by the Executive" in the national-security context).

Moreover, such a finding of necessity is likely immune from judicial review under the Administrative Procedure Act ("APA") and other statutes, even if the Secretary makes the determination by exercising delegated presidential power.[4] Under the APA, "agency action is not subject to judicial review to the extent that such action is committed to agency discretion by law." *Lincoln v. Vigil*, 508 U.S. 182, 190–91 (1993) (citation and internal quotation marks omitted). Review of an agency determination "is not to be had in those rare circumstances where the relevant statute is drawn so that a court would have no meaningful standard against which to judge the agency's exercise of discretion." *Id.* at 191 (citation and internal quotation marks omitted). Section 4511(a) clearly commits action to the discretion of the President or his delegee, allowing the decisionmaker to allocate materials "to such extent as *he shall deem* necessary or appropriate." 50 U.S.C. § 4511(a)(2) (emphasis added); *see also id.* § 4511(a)(1). In *Webster v. Doe*, the Supreme Court construed similar language to preclude APA review. 486 U.S. 592 (1988). The provision at issue allowed "termination of [a Central Intelligence] Agency employee whenever the Director 'shall *deem* such termination necessary or advisable in the interests of the United States,' not simply when the dismissal *is* necessary or advisable to those interests." *Id.* at 600 (emphases in original). The Court concluded that this provision "foreclose[d] the application of any meaningful judicial standard of review." *Id.* So too here, especially given the national-security context, where the Executive Branch traditionally wields broad and often-unreviewable discretion. *See Dep't of the Navy v. Egan*, 484 U.S. 518, 527, 529–30 (1988); *Lee v. Garland*, 120 F.4th 880, 886 (D.C. Cir. 2024).

## B.

As we have emphasized, the DPA immunizes entities from liability "for damages or penalties" stemming from "any act or failure to act resulting directly or indirectly from compliance" with an order issued under the Act. 50 U.S.C. § 4557. Three provisions of 50 U.S.C. § 4511 authorize the President to direct that Sable resume production of the SYU and

---

[4] The APA does not apply to the President, although "the President's actions may still be reviewed for constitutionality." *Franklin v. Massachusetts*, 505 U.S. 788, 801 (1992).

operate the associated pipeline infrastructure. An order issued under one of these provisions could preempt state law either expressly or by conflict. We address these provisions in the order best suited to our analysis: We start with the President's allocation authority under section 4511(a)(2); we then discuss his prioritization authority under section 4511(a)(1); and we conclude with his energy-production authority under section 4511(c).

### 1.

We consider first the President's allocation authority under section 4511(a)(2). That provision authorizes the President "to allocate materials, services, and facilities in such manner, upon such conditions, and to such extent as he shall deem necessary or appropriate to promote the national defense." 50 U.S.C. § 4511(a)(2). The term "materials" encompasses "any raw materials (including minerals, metals, and advanced processed materials), commodities, articles, components (including critical components), products, and items of supply," as well as "any technical information or services ancillary to the use of any such materials, commodities, articles, components, products, or items." *Id.* § 4552(13). The term "services" includes "any effort that is needed for or incidental to": (A) "the development, production, processing, distribution, delivery, or use of an industrial resource or a critical technology item"; (B) "the construction of facilities"; (C) "the movement of individuals and property by all modes of civil transportation"; or (D) "other national defense programs and activities." *Id.* § 4552(16).[5] And the "term 'facilities' includes all types of buildings, structures, or other improvements to real property . . . , and services relating to the use of any such building, structure, or other improvement." *Id.* § 4552(8). In the light of these broad definitions, we have previously opined that this section could "be used to facilitate petroleum transportation," such as "by requiring pipelines, marine terminals, and other facilities to perform oil transport contracts necessary or appropriate to promote the national defense." *Energy Supply Interruption*, 6 Op. O.L.C. at 665.

---

[5] Moreover, the phrase "industrial resources" as used in the Act means "materials, services, processes, or manufacturing equipment (including the processes, technologies, and ancillary services for the use of such equipment) needed to establish or maintain an efficient and modern national defense industrial base." 50 U.S.C. § 4552(12).

The President could expressly preempt California law through an order issued under this section. Section 4511(a)(2) authorizes the President to allocate materials, services, and facilities "in such manner" and "to such extent as he shall deem necessary or appropriate to promote the national defense." 50 U.S.C. § 4511(a)(2). This sweeping language allows the President to preempt contrary state law by ordering Sable to produce the recoverable oil located on the SYU and transport such production to the California refinery complex using the Santa Ynez Pipeline System. That conclusion follows directly from the capacious definitions of "materials," "services," and "facilities." *See id.* § 4552(8), (13), (16). The production and transportation of such oil—a "material"—is plainly a "service" within the meaning of the Act. *See id.* § 4552(13), (16). The Santa Ynez Pipeline System is, in our view, a facility within the meaning of the DPA, because it is an "improvement[] to real property," and operation of the pipeline system is a service "relating to the use" of that improvement. *Id.* § 4552(8). A DPA order could thus declare on its face that particular California environmental regulations, permitting requirements, or other restrictions are preempted with respect to Sable's production on the SYU and operation of the Santa Ynez Pipeline System. Indeed, if the President were to find that Sable being noncompliant with particular state laws is "necessary" to promote the national defense, *id.* § 4511(a)(2), he could instruct Sable to disregard state laws that would otherwise frustrate its obligations under the order.

One might suggest that the word "allocate" in section 4511(a)(2) allows the President only to *distribute* resources, not to compel their production. But that reading ignores critical statutory language. Section 4511(a)(2) authorizes the President to allocate not just materials but also "services"—which the Act defines to include "any effort that is needed for or incidental to" the "development" or "production" of "an industrial resource." *Id.* § 4552(16). The President's power to allocate services thus includes the power to allocate productive capacity itself. Moreover, section 4511(a)(2) grants the President discretion to allocate services "in such manner, upon such conditions, and to such extent as he shall deem necessary or appropriate," *id.* § 4511(a)(2), making clear that the President may determine how and to what degree to allocate productive capacity. That discretion necessarily entails the authority to compel production, not just to allocate materials that already exist. *See, e.g.*,

*Johnson v. Tyson Foods, Inc.*, 580 F. Supp. 3d 382, 389 (N.D. Tex. 2022) (holding that the President's allocation authority under the DPA allowed him to require meat facilities to remain open during the COVID-19 pandemic and preempt state tort law); *see also Reed v. Tyson Foods, Inc.*, No. 21-cv-01155, 2021 WL 5107725, at *6 (W.D. Tenn. Nov. 3, 2021) ("Because the purpose of the DPA cannot otherwise be accomplished while allowing states to implement their own, potentially inconsistent policy decisions for meat and poultry processor operations during the COVID-19 pandemic, the state law must yield." (cleaned up)). Indeed, an allocation order can "require[] a person to take or refrain from taking certain actions," including with respect to production of a resource. 15 C.F.R. § 700.33(b).

Our reading is also consistent with the DPA's context and history. The Act was modeled on the War Powers Acts, which conferred on the President sweeping authority to regulate industry during wartime. *See* Neenan, *supra*, at 2. And a critical component of wartime authority is ensuring adequate productive capacity. The DPA supplies comparable authority but before the outbreak of any conflict. When enacting the DPA, Congress found "the development of domestic productive capacity" critical for ensuring the national defense, 50 U.S.C. § 4502(a)(3), and similarly found it necessary "to assure the availability of domestic energy supplies," *id.* § 4502(a)(5). These congressional findings would mean little if the President could only shuffle existing inventory rather than direct facilities to produce energy.[6]

We emphasize that the precise preemptive scope of a presidential order would depend upon the language employed in relation to the obligations imposed by state law. We cannot opine on the preemptive reach of an order not yet drafted. Moreover, because "hypothetical or potential conflict is insufficient" to preempt state law by conflict, the wording

---

[6] The President's authority to compel production is even more pronounced under section 4511(c), which allows the President to use the allocation power "in order to maximize domestic energy supplies." 50 U.S.C. § 4511(c)(1). We discuss section 4511(c) in greater detail below, but the word "allocate" must be "given more precise content by the neighboring words with which it is associated," *Fischer v. United States*, 144 S. Ct. 2176, 2183 (2024) (citation omitted), and "identical words and phrases within the same statute should normally be given the same meaning," *Powerex Corp. v. Reliant Energy Servs., Inc.*, 551 U.S. 224, 232 (2007).

of any DPA order will affect the scope of conflict preemption. *Rice v. Norman Williams Co.*, 458 U.S. 654, 659 (1982).[7] According to Sable, "California agencies have deployed an array of state measures . . . to block pipeline operations," including "[enforcement of California] SB 237, the state waiver process, novel interpretations of state agency jurisdiction and authority, [and] excessive delay in granting a long-term easement through a state park for an existing pipeline." Sable Letter at 6. If such state measures make it impossible for Sable immediately to resume production and distribution of oil located on the SYU, they would be displaced as a matter of conflict preemption if a presidential order directed Sable to resume production immediately. Such an order would "irreconcilably conflict" with the terms of California state law. *Merck Sharp & Dohme Corp.*, 139 S. Ct. at 1679 (cleaned up).

**2.**

The President's prioritization authority under section 4511(a)(1) also allows him to preempt state law. Section 4511(a)(1) authorizes the President "to require that performance under contracts or orders" that "he deems necessary or appropriate to promote the national defense shall take priority over performance under any other contract or order." 50 U.S.C. § 4511(a)(1). Recall that "[i]n executing a contract under the DPA, a contractor is not liable for actions taken to comply with" a presidential order issued pursuant to the Act. Neenan, *supra*, at 6. Moreover, the President can also "prioritize the performance of contracts between two private parties." *Id.*

The President could issue an order under section 4511(a)(1) to expressly preempt certain state laws that, in the President's judgment, would impair or delay prioritized contract performance. *See E. Air Lines, Inc. v.*

---

[7] The DPA immunizes entities from liability for any act "resulting directly *or indirectly* from compliance" with an order issued under the Act. 50 U.S.C. § 4557 (emphasis added). It is thus possible that a DPA order might preempt state law to the extent that an entity's compliance with that order would result—even indirectly—in a breach of state law. Section 4557's immunity for acts resulting indirectly from compliance with a DPA order suggests that Congress anticipated that DPA orders might engender conflict with other legal obligations, even where dual compliance remains technically possible. But it is not necessary for us in answering your question to decide whether the DPA in effect lowers the standard for conflict preemption, so we do not decide it here.

*McDonnell Douglas Corp.*, 532 F.2d 957, 993 (5th Cir. 1976) ("Congress intended to accord the Executive Branch great flexibility in molding its priorities policies to the frequently unanticipated exigencies of national defense."). The President could, for instance, instruct that Sable's contracts for oil production and transportation take priority over Sable's other contractual obligations and expressly preempt California environmental regulations insofar as they would impede that prioritized performance. By naming the preempted state laws on the face of the order, the President would eliminate any doubt about which legal requirements must give way to defense needs under the terms of the order.

An order issued under section 4511(a)(1) might also displace state contract law—which is often judge-made rather than statutory—by conflict. If the President requires that performance of certain contracts be prioritized over performance under any other contract or purchase order, state law rendering that prioritization impossible would be preempted. *Cf.* Memorandum for the Files, from Henry C. Whitaker, Principal Deputy Assistant Attorney General, Office of Legal Counsel, *Use of the Defense Production Act and the International Emergency Economic Powers Act to Regulate Industry During the Early Stages of the COVID-19 Pandemic* at 5–6 (Jan. 18, 2021). As we have explained, conflict preemption is a demanding standard; if Sable could prioritize the designated contracts while also complying with state law, state law would not necessarily be preempted. *But cf.* 50 U.S.C. § 4557 (shielding entities from liability for any act "resulting directly or indirectly from compliance" with a DPA order). But if state law would render Sable incapable of prioritizing the designated contracts, that state law would be displaced.

### 3.

Finally, section 4511(c) allows the President to preempt state law by wielding the allocation and prioritization powers "to maximize domestic energy supplies"—even in the absence of a national-defense finding. *See Energy Supply Interruption*, 6 Op. O.L.C. at 668 (citation omitted).[8]

---

[8] When updating our 1982 advice about the DPA in 2021, we wrote that "the powers granted in" section 4511 are "limited by" section 4511(b). Memorandum for Stuart F. Delery, Deputy Counsel to the President, Executive Office of the President, from Martin S. Lederman, Deputy Assistant Attorney General, Office of Legal

Section 4511(c) allows the President, upon making certain other findings, to "require the allocation of, or the priority performance under contracts or orders . . . relating to, materials, equipment, and services in order to maximize domestic energy supplies." 50 U.S.C. § 4511(c)(1). The words "materials" and "services" have the same capacious meanings as described above. *See id.* § 4552(13), (16).

The preemption analysis under section 4511(c) parallels that of the two provisions described above. In a directive requiring Sable to resume production and distribution of oil from the SYU, the President could exempt Sable from compliance with particular state laws, especially if the President were to find that compliance with such laws would threaten the ability to "maximize domestic energy supplies." *Id.* § 4511(c)(1). At minimum, an executive order would displace conflicting California law under traditional conflict-preemption principles, with the scope of preemption turning on the order's specific terms.

## IV.

State law, we have been advised, is not currently the only impediment to Sable's ability to resume production and transportation of oil. A consent decree entered in *United States v. Plains All American Pipeline L.P.*, No. 20-cv-02415 (C.D. Cal. Oct. 14, 2020), Dkt. 33 ("Consent Decree"), "currently vests authority over resumption of transportation through the onshore portions of the Santa Ynez Pipeline System with the California Office of the State Fire Marshal." Sable Letter at 9. We have been advised that, in addition to the United States and various State of California entities, Sable is a party to the Consent decree as a result of an acquisition. You have asked whether an executive order under the DPA would displace these provisions of the Consent Decree, even though there are both federal- and state-law claims at issue in that case. For three reasons, we think it would.

Counsel, *Re: Preliminary Review of Possible Legal Authorities Related to the Cyberattack Targeting the Colonial Pipeline* at 10 (May 12, 2021). But section 4511(c)(1) applies "[n]otwithstanding any other provision of this chapter." 50 U.S.C. § 4511(c)(1). To the extent that our more recent advice inadvertently suggested that section 4511(b) would limit the President's authority under section 4511(c), we take this opportunity to disclaim that suggestion.

*First*, section 4557 would likely immunize Sable from needing to satisfy these provisions of the Consent Decree if acting to comply with a DPA order. The Consent Decree includes a "stipulated penalties" provision for violations of its requirements. *See* Consent Decree at 27. But section 4557 provides that "[n]o person shall be held liable for damages or penalties for any act or failure to act resulting directly or indirectly from compliance with a rule, regulation, or order issued pursuant to this chapter." 50 U.S.C. § 4557. Thus, Sable would be immune from any penalties—including those imposed under the Consent Decree—for "any act or failure to act resulting directly or indirectly from compliance with" a DPA order. *Id.*

Section 4557 would also immunize Sable from liability for contempt under such circumstances. *See* Consent Decree at 39 (leaving "contempt" open as a sanction for violations). Civil contempt sanctions are "penalties designed to compel future compliance" with a consent decree. *Int'l Union, United Mine Workers of Am. v. Bagwell*, 512 U.S. 821, 827 (1994); *see also Lackey v. Stinnie*, 145 S. Ct. 659, 671 (2025) ("Violation of a consent decree is enforceable by a citation for contempt."). Civil contempt sanctions can take the form of monetary fines or sentences of imprisonment. *See Hicks ex rel. Feiock v. Feiock*, 485 U.S. 624, 631–32 (1988). Monetary fines to compel future compliance with the Consent Decree here, of course, may not be imposed for any act or omission resulting from compliance with a DPA order. *See* 50 U.S.C. § 4557. So too for sentences of imprisonment imposed for the same reason. The word "penalty" meant "a punishment imposed or incurred for a violation of law or rule." *The American College Dictionary* 895 (1948 ed.); *see also Webster's New Collegiate Dictionary* 621 (2d ed. 1956) ("*Webster's*"); *The Oxford Universal Dictionary* 1462 (3d ed. 1955). Nor was the word "liable" limited to monetary liability. *See, e.g.*, *Webster's* at 484 ("Bound or obliged by law or submission to other forces; answerable"). And limiting the word "penalties" to only monetary fines would be incongruous with the rest of section 4557 and the DPA more broadly, which ensure that the President can displace impediments to productive capacity when necessary. Indeed, it would be anomalous to think that section 4557 forbids the imposition of monetary fines but not the harsher penalty of imprisonment.

*Second*, a DPA order could constitute a force majeure under the Consent Decree. In particular, the Consent Decree defines a force majeure "as

any event arising from causes beyond the control of Defendants . . . that delays or prevents the performance of any obligation under this Consent Decree despite Defendants' best efforts to fulfill the obligation." Consent Decree at 35. The issuance of a DPA order would likely constitute an "event" arising from causes beyond the control of Sable, and complying with the order might delay or prevent the performance of Sable's obligations under the Consent Decree.

*Third*, the issuance of a DPA order might also constitute changed circumstances sufficient to require modification of the Consent Decree. A consent decree "must" be modified if one of its obligations "has become impermissible under federal law." *Rufo v. Inmates of Suffolk Cnty. Jail*, 502 U.S. 367, 388 (1992). And as we have explained, a DPA order has the force of federal law. If a DPA order requires Sable to take an action that is prohibited by the Consent Decree, the Consent Decree likely must be modified.

\* \* \* \* \*

The DPA authorizes the President to regulate private entities in ways that may be inconsistent with state law. An order issued under that authority could preempt state law either expressly or by conflict. And it may displace certain provisions of the Consent Decree described above, including those vesting authority over resumption of transportation with the California Office of the State Fire Marshal.

T. ELLIOT GAISER
*Assistant Attorney General*
*Office of Legal Counsel*
